The State of Iowa, Appellant, v. Chicago, Milwaukee & St. Paul Railway Company, Appellee.

Railroads: SWITCHING SERVICE: ORDER OF RAILROAD COMMISSIONERS. A movement of cars upon the main line of a railroad outside of yard limits, under orders of the train dispatcher and not of the yard master, is not a switching service; and an order of the railroad commissioners directing the defendant to transfer cars, received at its yard from another line, to the plaintiff's works, situated on its main line one mile beyond its yard limits, at switching rates, is unwarranted, and will not be enforced.

*Appeal from Dubuque District Court.*—HON. JOHN J. NEY, Judge.

TUESDAY, MAY 23, 1893.

THIS action was commenced with the railroad commissioners as plaintiffs, and the state subsequently substituted. It is an action to enforce an order of the railroad commissioners to the defendant company for the switching of cars from the station at Dubuque, Iowa, to Eagle Point, a place within the city of Dubuque. The necessary facts are as follows:

Fendler & Schwaegler is a firm doing a business of burning lime at Eagle Point. The firm contracted with the Niagara Fuel-Oil Company, of Lima, Ohio, for fuel oil for use in its business; the oil to be furnished at the rate of seventy-five cents per barrel delivered at Eagle Point. The oil was shipped in tanks, and was, for a time, taken over the lines of the defendant company from Chicago to its destination at Eagle Point. Because of an advance in rates on the defendant's line, the transportation was so changed that from Chicago the oil came over the line of the Chicago, St. Paul & Kansas City Railway to Dubuque, at the rate formerly charged by the defendant company. This latter line has no road running to Eagle Point, nor has any company except the defendant. The defendant company refused, for a time, to transfer the cars with the oil over its line to Eagle Point. This led to a complaint by the oil company, through its president, E. J. Little, to the railroad commissioners, which is as follows:

"The complainant states that the Niagara Fuel-Oil Company is a corporation doing business at Lima, Ohio, shipping fuel oil for manufacturing purposes. That, prior to August twenty-fourth, last, they have been shipping west of Chicago over the line of the Chicago, Milwaukee & St. Paul Railway. That in January,

1889, they contracted with Fendler & Schwaegler, of Dubuque, Iowa, to deliver fuel oil for 1889 at their lime kilns near the city of Dubuque, at a certain figure, based on a fourteen cent through freight rate, or fifty-three dollars and eighty cents per car, the rate then existing on respondent's line. That on or about August twelfth respondent road advanced its rates to eighty-six dollars and forty-seven cents per car, an increase of nearly thirty-three dollars, which rates were so exorbitant as to deprive them of any profit on shipments; in fact, if paid, would subject them, under their contract, to serious loss. That the Chicago, St. Paul & Kansas City Railway, a line running parallel to respondent's road, declined to advance rates, and complainant has since been shipping over said road to Dubuque. That, on the arrival of shipments at place of destination, respondent road refused, and still refuses, to switch said cars to the lime kilns of Messrs. Fendler & Schwaegler, when asked to do so by both the Chicago, St. Paul & Kansas City Railway and complainant, accompanied with a tender of switching charges; the switches of respondent being the only ones running to said kilns. That Messrs. Fendler & Schwaegler have been seriously hindered and damaged by failure to receive the shipments of oil, of which they use large quantities, and have been compelled to extinguish the fires in their works at two different times, and suspend operations three days at one time, and four at another. That complainant is held for the damage already sustained, caused by respondent road's refusal to switch cars as aforesaid, and will be greatly damaged in the future unless relief is obtained."

The complaint is "for refusal to switch cars tendered at Dubuque, Iowa, October 14, 1889, with switching charges." Upon investigation, the commissioners ordered the defendant company to "take shipments above, and any other that may be tendered them by

connecting lines, and switch them as required by law."
The company then established a station at Eagle Point,
and announced its readiness to transfer the oil cars,
but, as we understand, upon a basis of charges in con-
formity with the rates fixed by the commissioners in
this state for the regular transportation of freight, under
which, for five miles or less, the rate per car would be,
as the commissioners state, "thirteen to fifteen dollars,"
the distance from Dubuque station to Eagle Point
being three and one-tenth miles." The commissioners,
in their order, fixed the rate at two dollars for three
miles, but fixed no rate for an excess. Thereafter, in
the same case, they made an order fixing the rates for
switching at Dubuque as follows: "For any distance
not exceeding one mile, $1.00; for any distance in
excess of one mile, and not more than two miles, $1.50;
for any distance in excess of two miles, and not more
than three miles, $2; for any distance in excess of
three miles, and not exceeding four miles, $2.50."
Upon a neglect or refusal of the company to obey the
order, this action was instituted in the district court of
Dubuque county for its enforcement, and that court,
upon the submission of the cause, dismissed the peti-
tion, and the plaintiff appealed. Other minor facts
may be noticed in considering the case.—*Affirmed.*

*John Y. Stone,* Attorney General, and *D. E. Lyon,*
for the State.

*John W. Cary* and *W. J. Knight,* for appellee.

GRANGER, J.—From the record we find three ways
of operating or moving cars on railways,—by "regular
trains," by "extra" or "special" trains, and by switch-
ing. Trains, whether regular or special, are generally
upon the main line, and under orders from a train dis-
patcher. Switching is done by a crew with an engine,
and is under the direction of a yard master, and within

the yard limits. If the engine goes outside of the yard limits, it is under special orders, the same as a special train. Within the yard it is operated under general orders to the yard master to keep out of the way of regular trains on the main line.

Eagle Point is a little more than a mile north of the yard limits of Dubuque station. The order of the commissioners requires the defendant company to transfer, not only the cars with oil, but all others tendered to it, as a switching service. Eagle Point was not, at the commencement of the proceeding before the commissioners, a regular station on the defendant's line, but there was a side track there, and for years cars had been switched from the main line onto this track with fuel and other supplies for Fendler and Fendler & Schwaegler, and perhaps for others. Prior to the time when the oil company transferred its cars to be hauled over the Chicago, St. Paul & Kansas City Railway from Chicago to Dubuque, the defendant company had transferred cars for other companies from Dubuque to Eagle Point at a rate of from two to three dollars per car, and it may be regarded as having been a place of local railway traffic on the defendant's line of road, though not a regular station.

From the opinion of the commissioners, which is in evidence, it appears that they regarded Eagle Point as within the city and yard limits, for they say: "In the case in controversy the board is of the unanimous opinion that the service required of the respondent road is local in its character, confined to the city limits and yard and sidings of the respondent company." As to its being within the city limits, our conclusion is the same, but upon the question of the yard limits the commissioners must have been favored with evidence not before us, for, under this record, it is beyond question more than a mile outside of the yard limits, and

accessible only over the company's main track.  It is further an undisputed fact that the switching crew and engine never passed from the yards to Eagle Point, except under train orders, and as doing special train service.

It is, of course, our duty to try these cases, wherein we are to determine whether the orders of the commissioners are "just and equitable," under the facts as disclosed by the record, and it is to be regretted that the state of the law is such that they may reach their conclusions on a state of facts entirely different from those upon which ours are reached.  In this case we find, as we must, that the switching service ordered is, in part, over the main track of the company's line to a side track at least a mile outside the yard limits.

We have the undoubted assurance that the commissioners under the facts as we find them, would not have made the order for a switching service in this case.  This assurance is based on a previous investigation and conclusion of the commissioners in the case of Wylie against this same company.  The case is reported in the commissioners' report for 1890 at page 901.  The cases are remarkably similar as to controlling facts.  In that case, as in this, it seems that a service had been rendered by the switching engine and crew outside of yard limits on a main line to a "side track station," called "Oakton," within the city limits of Davenport, and three miles from the Davenport station.  The facts of that case, as stated by the commissioners, are as follows:

"On June 9, 1890, Mr. Wylie complains that the Chicago, Milwaukee & St. Paul Railway Company charges him thirty cents per ton for switching soft coal from his yard which is three-fourths miles north of its Davenport station, to the Oakton switch.  The Oakton switch is within the limits of the city of Davenport as

extended, and about three miles from the Davenport station, making the distance about two and one-quarter miles. The complainant states that the Chicago, Rock Island & Pacific Railway Company switches cars to the glucose works in Davenport, about the same distance, for one dollar per car. The principal use of the Oakton side track station is stated to be for setting out cars of supplies for the orphans' home, situated near the side track. Mr. Wylie asks the board whether the road is allowed to retain their present tariff to this station."

The commissioners, properly we think, regarded that case as involving a determination of what was properly a switching service, so as to know if they could fix the charges as applicable to such a service, or if they must regard it as a train service, so as to bring it under the regular schedule of tariffs for such a service. The commissioners then defined "switching" in the following language: "The general definition of a switch is that movement of cars within yard limits where an engine and cars may run without orders from the dispatcher, or, in other words, that occupancy of tracks that belongs to yard engines, and where all approaching trains are expected to run with special care, knowing that their rights of track are second to switching trains." In reply to Mr. Wylie the commissioners stated that they "had finally settled down to this view: That a switch is that delivery within or without yard limits that is ordinarily made with a switch or special engine and crew, and does not partake of the character of the ordinary train made up for service over a line of road. While this work may be done by regular train, it is understood as the work usually done by the switching crew."

The following, from the commissioners, further indicates the similarity of the two cases as to facts: "At the hearing Mr. Wylie stated that up to July, 1888,

the company treated this service as a switch, and charged two dollars per car. That the cars were taken out by the switch engine that pushed the freight trains up the grade, and that the empty cars were brought back from this station when it returned, after the loaded cars had been put on the Oakton siding. From June 4, 1889, to June 11, 1890, one hundred and five cars were taken to Oakton. That at thirty cents per ton he is unable to compete for business, and must abandon it." It then appeared in that case, as undisputed, that when the switch engine went to Oakton it went under special orders. The conclusion was that the service was "not a switching service, but a haul from one station to another station," and, to meet the emergency, the commissioners adjusted the tariff rates to make them twenty instead of thirty cents per ton for coal between those stations. We are not aware of a single fact in this case, and not in that, favorable to the conclusion that the service from Dubuque to Eagle Point was a switching service. We do not understand that the commissioners have intended to interfere with, or change the facts as to, what shall constitute the different classes of service in regard to operating trains, for it must be understood that such prerogative, if it exists, should be exercised with the utmost caution, in view of the public and private interests involved, and the consequences liable to flow from such an interference. Nor did they confound the different services because of the crew or engine by which it is rendered, but characterize each, as should be the case, by the manner and place of the service,—as, where a regular train crew does switching duty, as is often the case, it is switching service; and the commissioners, speaking of switching, say: "While this work may be done by the regular trains, it is understood as the work usually done by the switching crew." The other conclusion necessarily follows that, where the switching crew does

the work usually done by a train crew under orders from a dispatcher, it is a "train," and not a "switching" service. This precise rule was applied in the *Wylie case*. So far as the point under consideration is involved, we think the conclusions in the *Wylie case* are unassailable from a legal, and, we may add, equitable, standpoint. It gave a remedy for what, in the judgment of the commissioners, was a wrong without any unwarrantable interference with train regulation and management, in particulars as to which interference might involve prejudice as to some without a compensating advantage to any one. The importance of leaving railway management, in its details, to the wisdom and discretion of those who, from education and experience, can best control it in the interest of all concerned, is manifest.

Misapprehension should be avoided because of what is said in this opinion in connection with the definition given by the commissioners as to what constitutes switching. It is, perhaps, not best here to place any arbitrary limitation upon the term. The commissioners do not, nor do we, think that such a service is bounded always by yard limits, for there may be outside trackage on which such a service, under proper regulations, would be rendered; but we hold, as we think the commissioners have, that a service upon a main line, outside of yard limits and under orders, as in cases of regular or special trains, is not a switching service. If the order of the commissioners is to be enforced by a decree in this case, the enforcement involves a change in the management of the company as to classification and operation of its trains. Its line for switching service must be extended to Eagle Point, and a part of the main line track, outside the yard limits, must be subjected to switching service under direction of the yard master. We are convinced that no such result was ever contemplated by the order, and, further, that,

with the facts as they appear before us, such an order would never have been made. It is not an order, that under the law, we can sustain.

The district court, upon the same record, reached the conclusion that the petition should be dismissed, and its judgment is AFFIRMED.